Jack T. RUTLEDGE and Gladys P. Rutledge, Appellants,

v.

UNION ELECTRIC COMPANY OF MISSOURI, a corporation, Respondent.

No. 44341.

Supreme Court of Missouri.

Division No. 1.

June 13, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied July 11, 1955.

Henry G. Eager, Roy P. Swanson, Kansas City, Austin Walden, Moberly, for appellants. Blackmar, Newkirk, Eager, Swanson & Midgley, Kansas City, of counsel.

Harry H. Kay, Eldon, Hunter, Chamier & Motley, Moberly, for respondent. John A. Woodbridge, St. Louis, of counsel.

PER CURIAM.

Plaintiffs had verdict and judgment against defendant for $16,778.30. Upon defendant's motion, the trial court set aside the verdict and judgment and entered judgment for defendant. Plaintiffs appealed.

Defendant is the owner and operator of Bagnell Dam and power plant (completed in 1931) across the Osage River in Miller County. The top of the dam is at elevation 670 feet above mean sea level. Back of the dam is the Lake of the Ozarks. The water level of the lake "at full reservoir" is at elevation 660 feet.

Plaintiffs, husband and wife, are owners of land bordering the lake east and south of the dam, two miles by road and seventeen miles by water. They own and operate the Arrowhead Yacht Club, a year-round business, selling, renting, storing and repairing boats and cruisers and selling marine equip-

ment and supplies. Upon plaintiffs' tract are a parking lot, two large two-story buildings (in one of which is an apartment in which plaintiffs live) and, between the buildings, a track upon a concrete ramp. The tops of the foundations of the buildings are a little above the 661-foot elevation. There is a floating dock, 6 feet wide and 500 feet long, cable-anchored to the land. Along the dock are 55 covered "wells" for storage of lake craft.

It was not disputed that the dam, power house and works appurtenant thereto had been designed and constructed to hold the water level at the dam at "approximately 660 feet" above sea level. It was stipulated that "the difference between the elevation of the water at the dam [660 feet] and at" plaintiffs' property was "so slight that the elevations at the two places may be taken to be the same." In June 1948, the lake's water level rose to 663.1 feet; in June and July 1951, to 664.4 feet; and in September 1951, to 663.4 feet. As a result, plaintiffs' land and personal property were flooded and damaged by lake water and plaintiffs sustained other damages, viz., costs of "clean-up work" and financial loss from interruption of business operations.

At the trial, defendant admitted that "the use and operation of the dam * * * at the times" above mentioned "directly caused the water of the lake to rise above elevation 660." Plaintiffs alleged in their petition that their land had been "flooded and inundated by water as a direct and proximate result of defendant's wrongful use and operation of the dam." Before the trial, the trial court, upon plaintiffs' motion, struck out defendant's affirmative defense of operation of the dam and power plant in compliance with regulations of the Federal Power Commission. Prior to submitting their case, plaintiffs deleted the word "wrongful" from the above-quoted language of the petition. Plaintiffs did not submit any issue as to defendant's wrongful or negligent operation or maintenance of the dam, power plant and works appurtenant thereto. In their oral argument in this court, counsel agreed that there is no issue as to defendant's negligent operation of the dam and power plant.

Defendant denied liability on the ground that it had an easement to flood plaintiffs' land above the 660-foot elevation. By a "Warranty Deed of Easement," dated November 12, 1930, Edna Hartwell, single, plaintiffs' predecessor in title, did "grant, bargain and sell unto" defendant "the rights and easements described in paragraphs (a) and (b) below in and to * * * the East fractional Half (E. frl. ½) Right Bank Osage River, Section Thirty-One (31), Township Forty (40), Range Fifteen (15), Miller County, Missouri .

"(a) To back water over or under, submerge, flood or otherwise damage said tracts or parcels of land through backwater or otherwise, whether caused by flooding, erosion, seepage ground water, lack of drainage, obstructed drainage, or in any manner whatever, resulting from the construction, operation and maintenance of the dam, power plant and works appurtenant thereto, located in, across or adjacent to the Osage River at approximately Mile 75 on said River, in Miller County, Missouri, and constructed in accordance with plans now or hereafter made and approved by the Federal Power Commission for Project No. 459. Said dam, power house and works appurtenant thereto shall be designed to hold the water level at the dam at approximately 660 feet above mean sea level;

"(b) To have rights of ingress and egress, to enter and re-enter upon, to clear and to keep clear of trees and other objects such portion or portions of said lands as is required by the following provision of Federal Power Commission license issued for said Project No. 459.

" 'The Licensee shall cut and remove or destroy to the satisfaction of said District Engineer, all brush and trees from that zone within and adjacent to the area to be submerged which is included between the elevation of 630 feet above mean sea level and 15 feet horizontally from and outside of elevation 660 feet above mean sea level,

and shall remove or destroy all floatable refuse or other material within said area to be submerged. The Licensee shall also cut in such manner or so remove or destroy brush or trees within said area to be submerged and below said elevation 630 feet, that no part of such brush or trees shall project above said elevation 630 feet.'

"To Have And To Hold the aforesaid easements in, upon, over and to the premises hereby conveyed, with all the rights, privileges and appurtenances thereto belonging or in anywise appertaining, unto the said Union Electric Light and Power Company, its successors and assigns, so long as any of the said lands shall be wholly or partially and/or continuously or intermittently submerged or affected by said waters throughout the full period of the maintenance by the said Union Electric Light and Power Company, its successors or assigns, of said dam or any other or any reconstructed dam at or near said site, under the license heretofore issued for said Project No. 459, or under any license which may hereafter be issued to Union Electric Light and Power Company, its successors or assigns, and throughout the full period of the maintenance of such dam or any other or any reconstructed dam by the United States Government after the expiration of such license or licenses; the said Edna Hartwell hereby covenanting to and with the said Union Electric Light and Power Company, its successors and assigns, for herself, her heirs, executors and administrators, to warrant and defend the title to the premises hereby conveyed and to the easements hereby conveyed against the claim of very person whomsoever.

"Throughout the life of this easement Union Electric Light and Power Company, its successors or assigns, shall pay the taxes, if any, which may be legally assessed against such part of the above described lands as normally remains continuously submerged after said dam has been constructed and put into operation, the taxes against the portion not so submerged to be paid by grantors, their heirs or assigns."

The sole issue here is the construction of the "Warranty Deed of Easement." As plaintiffs say: "This case turns upon a determination of whether the instrument imposes *any* limitation on the grantee's easement rights."

In considering this deed, we determine the grantor's intention and effectuate that intention unless it conflicts with some positive rule of law. Leeper v. Leeper, 347 Mo. 442, 147 S.W.2d 660, 662 [1], 133 A.L.R. 586. We read the deed in its entirety, consider all of its provisions, ignore technical distinctions between its various parts and give no undue preference to any one provision. Triplett v. Triplett, 332 Mo. 870, 60 S.W.2d 13, 15 [1, 2]; Keller v. Keller, 343 Mo. 815, 123 S.W.2d 113, 115 [1-4].

Defendant's position is that the deed vested in defendant the right to flood plaintiffs' land as would be necessarily flooded—either wholly or partially or continuously or intermittently—at any time as a result of the construction, operation and maintenance of the dam. The first sentence of paragraph (a) expressly and unequivocally grants to defendant the right to "submerge, flood or otherwise damage" plaintiffs' land "through backwater *or otherwise, whether caused by flooding * * * or in any manner whatever,* resulting from the construction, operation and maintenance of the dam, power plant and works appurtenant thereto." (Our italics.) And note the broad, explicit language of the habendum clause—"so long as *any* of the said lands shall be *wholly or partially and/or continuously or intermittently submerged or affected by said waters* throughout the full period of the maintenance" of the dam ("or any other or any reconstructed dam at or near the site"). (Our italics.)

Plaintiffs concede that the first sentence of paragraph (a) conveys "the right(s) * * * to back water over or under, submerge, flood or otherwise damage * * * in any manner whatever * * * by reason of the dam." However, plaintiffs contend, the unqualified rights granted by the first

sentence of paragraph (a) are limited and qualified by other provisions of the deed. Plaintiffs' position is that the deed created an easement to flood only to "approximately 660 feet" above sea level; that "if this easement is not so limited to 'approximately 660 feet' above sea level, then there are no limitations at all"; and that the phrase, "approximately 660 feet," cannot reasonably be construed to extend to an elevation of more than 661 feet.

Plaintiffs rely chiefly upon the second sentence of paragraph (a): "Said dam, power house and works appurtenant thereto shall be designed to hold the water level at the dam at approximately 660 feet above mean sea level."

Plaintiffs argue that if the rights granted by the first sentence of paragraph (a) "are not limited and qualified by the language 'approximately 660 feet' which appears in [the second sentence of] paragraph (a), then we think it follows that the holder of the dominant estate may properly inundate *all* of this one-half section to an *unlimited* height for an indefinite period of time. This we say because nowhere in this deed do we find any other language which could be said to have any restrictive effect on this easement. It is clear that this easement * * * fails to mention any length of time during which dam-impounded water can remain upon the premises; and, in referring to maximum heights, uses only the level 660. * * * This dam was designed to create a permanent body of water which would extend up * * * to a maximum elevation of 660 feet above sea level. This is the height which is meant in the language, 'said dam * * * shall be designed to hold the water level at the dam at approximately 660 feet above mean sea level.'" And, plaintiffs urge, since the water levels at the dam and at plaintiffs' property were the same, the second sentence of paragraph (a) *could* be construed as meaning that the dam had been designed to hold the water level at plaintiffs' property at approximately 660 feet above sea level.

Further, plaintiffs argue: " 'Approximately 660 feet' becomes a vertical height limit above which flooding or other damage is not contemplated and since appearing in the granting clause probably even is contractual. Any flowage rights can exist *only* when they are 'resulting from the * * * dam.' The essential language to which we refer is in the sentence immediately following this which begins 'Said dam' and so would appear to modify 'dam' just as much as if no period had been inserted. Thus all flowage rights under this grant are first limited and restricted to those 'resulting from the * * * dam,' which dam is in turn confined to a water level of 'approximately 660 feet.' "

We agree that defendant's right to flood plaintiffs' land was that of flowage resulting from defendant's "construction, operation and maintenance of the dam, power plant and works appurtenant thereto." However, that is not an issue as it was admitted that the 1948 and 1951 floodings were the result of such construction, operation and maintenance. The particular issue is whether the second sentence of paragraph (a) limited or qualified in any way the unlimited flowage rights granted by the first sentence of paragraph (a).

We cannot agree with plaintiffs that the second sentence of paragraph (a) should be construed to read that the dam had been designed to hold the lake's water level to a *maximum* elevation of approximately 660 feet. It is our view that the "approximately 660 feet" reference is to *normal* lake level. The first sentence does not limit defendant's right to flood plaintiffs' land to either the "approximately" 660 foot contour or to any other contour. That sentence granted to defendant the right to flood plaintiffs' land to *any* height. The subject matter of the second sentence is the water level of the lake. The second sentence contains no reference whatsoever to *flowage rights* resulting from the construction, operation and maintenance of the dam. We cannot construe the language in the second sentence, "approximately 660 feet," as limiting defendant's right to flood plaintiffs' land to "approximately" that contour.

Paragraph (b) · grants · to defendant "rights· of ingress and egress, to enter and re-enter upon, to clear and keep clear of trees and other objects such portion or portions of said lands as is required by the following provision of" the Federal Power Commission license under which the dam was to be constructed, maintained and operated: "The Licensee (defendant) shall cut and remove or destroy * * * all brush and trees from that zone within and adjacent to the area to be submerged which is included between the elevation of 630 feet above mean sea level and 15 feet horizontally from and outside of elevation 660 feet above mean sea level, and shall remove and destroy all floatable refuse or other material within said area to be submerged. * * *"

Plaintiffs argue that paragraph (b) "expressly indicates that the area 'to be submerged' will *end* at the vertical height of 660 feet. * * * Observe that while '*all* floatable refuse' below the vertical elevation of 660 feet must be cut and removed, it is only 'brush and trees' within 15 feet measured horizontally back from this 660 foot mark which must be cleared. This can only mean, we think, that the shore-line is to be at 660 feet and not elsewhere. * * * We firmly believe that paragraph (b) contemplates a maximum lake elevation at *some* point. * * * Paragraph (b) * * * does permit ingress and egress *above* the 660 foot line for a limited purpose, but *not* for flooding."

We agree with plaintiffs that paragraph (b) "does permit ingress and egress upon plaintiffs' land above the 660 foot contour for a limited purpose," viz., to cut and remove all brush and trees within the 15 foot horizontal zone above that contour. We also agree that paragraph (b) itself conveyed to defendant no right to flood plaintiffs' land above that contour. The express easement of ingress and egress to cut trees and brush obviously does not include "ingress and egress" by flood waters.

However, we do not agree that paragraph (b) "contemplates a maximum lake elevation at *some* point." We cannot construe paragraph (b) as limiting defendant's flowage rights to the "approximately 660" foot contour. Paragraph (b) contains no reference to *flowage rights* resulting from the construction, operation and maintenance of the dam. Paragraph (b) grants "*rights of ingress and egress*" in the zone "within and adjacent to the area *to be submerged*" between the *elevations* (not the lake's water levels) 630 feet and 15 feet horizontally from and outside the *elevation* 660 feet "and to remove or destroy all floatable refuse or other material within said area *to be submerged*."

Plaintiffs next call attention to the provision which obligates defendant to pay taxes * * * against such part of the "lands" as *normally remains continuously submerged* * * *, the taxes against the *portion not so submerged* to be paid by grantors, their heirs or assigns." (Our italics.) Plaintiffs argue that this provision indicates that the *maximum* flowage height was "approximately 660 feet." However, the above italicized language clearly shows that defendant was to pay the taxes on such land "as normally remains continuously submerged" and that the grantor (and plaintiffs as her successor in title) were to pay the taxes on such land "as normally does not remain so continuously submerged." The tax provision neither deals with nor refers to defendant's flowage rights.

As we construe the "Warranty Deed of Easement" in its entirety, as we read together all of its provisions, we believe that the intent of the grantor and the grantee was this: The land "normally that is continuously submerged" is land which normally would be submerged by the dam designed and constructed to hold the lake's normal water level at approximately 660 feet; that defendant, in its non-negligent operation and maintenance of the dam, power house and works appurtenant thereto, was to have the right to flood plaintiffs' land above that normal lake level. We so hold.

The judgment is affirmed.