Eugene **CARVIN; Donna Carvin, on behalf of themselves and all others similarly situated; James H. Breashears; Sharlene G. Breashears; Clifton E. Buck; Frances M. Buck; Dennis Carvin; Sara E. Bentley; Milton Couch; Janet M. Couch; Edwin C. Coulson; Anna Jeanette Coulson; Howard Cranford; Janice Cranford; Hazel Goodman; Jimmy W. Harris; Sandra D. Harris; Guy M. Hauser; James D. Honold; Willie Mae Honold; M.L. Hooper; Unknown Spouse of M.L. Hooper; Michael L. Hulsey; Unknown Spouse of Michael L. Hulsey; Effie Jenkins; Donna M. Johnson; Charles B. Joplin; Clarice M. Joplin; Fred B. Kruse; R. MacLambert; Patricia Lambert; T.M. McGregor; Aileen McGregor; Michael E. Mitchell; Brownie K. Mitchell; Russell A. New; Joe N. Nowell; Patsy M. Nowell; A.W. O'Keefe; Wayne Parsons; Roxanne M. Parsons; James W. Raney; Norma J. Raney; Evelyn W. Ray; John W. Rayfield; Lucille M. Rayfield; Terry J. Rickard; Patsy Rickard; Clark B. Robertson; Ruby Robertson; B.E. Rust; Kenneth M. Schnoeblen; Jean Schnoeblen; Leon E. Scott; Unknown Spouse of Leon E. Scott; Billy J. Smallwood; Mary S. Smallwood; Hoyt W. Smart; Virginia A. Smart; William F. Smith;**

William H. Stovall; Patricia Lee Sto-
vall; A.W. Taylor; Lois Irene Taylor;
Donna J. Whistle; Jerry S. Yahoda;
Jane L. Yahoda; Chester I. Ziemienski;
Anna Q. Ziemienski, Plaintiffs–Appel-
lants,

v.

ARKANSAS POWER AND LIGHT COM-
PANY, an Arkansas Corporation, De-
fendant–Appellee,

Federal Signal Corporation, an Illinois
Corporation, Defendant,

Entergy Services, a Delaware
Corporation, Defendant–
Appellee.

Martin D. DANFORD; Faye A. Danford;
Anthony Dematteo; Nancy Dematteo;
Stanley P. Dodd; Sally P. Dodd; Harry
D. Peterson; Elaine R. Peterson, Plain-
tiffs–Appellants,

v.

ARKANSAS POWER AND LIGHT COM-
PANY, an Arkansas Corporation; En-
tergy Services, Inc., a Delaware Corpora-
tion, Defendants–Appellees.

Nos. 92–1984, 92–2000.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1992.

Decided Dec. 30, 1993.

Rehearing and Suggestion for
Rehearing En Banc Denied
March 2, 1994.*

---

* Richard S. Arnold, Chief Judge, took no part in
the consideration or decision of this case.

Beam, Circuit Judge, would grant the suggestion
for rehearing en banc.

Clark W. Mason, Little Rock, AR, argued, for Anna Ziemienski; Stephen Boynton, Washington, DC, argued, for Elaine R. Peterson (John P. Lewis and Wm. Roberts Wilson, on brief), for appellants.

William H. Sutton, Little Rock, AR, argued (Walter A. Paulson, II, on brief), for appellees.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BATTEY,** District Judge.

JOHN R. GIBSON, Circuit Judge.

In this diversity case, two groups of landowners appeal from a summary judgment denying their claims for real and personal property loss caused by a flood, which they claimed resulted from the negligence of the Arkansas Power & Light Company and Entergy Services, Inc. The district court[1] entered summary judgment for AP & L because the plaintiff landowners held the land subject to flowage easements in favor of AP & L. On appeal, the landowners argue that the easements do not affect their negligence claims, that AP & L breached a statutory duty owed them, that AP & L was estopped from exercising its easement rights, and that the defendants breached their duty to warn the landowners of the flood. We affirm the judgment of the district court.

These cases arise out of a flood on Lake Catherine on May 19–20, 1990. Lake Catherine is third and smallest in a series of three lakes created by hydroelectric dams on the Ouachita River near Hot Springs, Arkansas. The dam farthest upstream is Blakely Mountain Dam, an Army Corps of Engineers dam which creates Lake Ouachita, the largest lake in the chain, at a normal volume of 2,151,000 acre feet with flood control volume of an additional 617,000 acre feet. AP & L owns and operates the next two dams, Carpenter Dam and Remmel Dam, and the lakes they create. The lake behind Carpenter Dam is Lake Hamilton, maintained at 399 feet above sea level, with a normal volume of 190,560 acre feet. Lake Catherine lies below Carpenter Dam and is created by Remmel Dam. Lake Catherine's normal pool elevation is maintained at 305 feet above sea level and its normal pool volume is 36,700 acre feet.

Entergy Services, Inc. acted as the agent of AP & L in supervising the release of water from Carpenter and Remmel Dams. Entergy is a sister corporation to AP & L, so we shall refer to them collectively as AP & L.

Though at the time Remmel Dam was built, the land surrounding Lake Catherine was primarily woods and pastures, there has since been extensive development on the shores of Lake Catherine, ranging from mobile homes to lake houses.

On May 19 and 20, 1990, extraordinarily heavy rains fell in the Ouachita River Basin, especially over the lower end of Lake Hamilton and much of Lake Catherine. In the twelve-hour period from 6:00 p.m. May 19, 1990 to 6:00 a.m. May 20, 1990, there was rainfall of ten inches at Carpenter Dam, seven inches at Remmel Dam, and twelve inches in nearby Hot Springs, with most of the rain falling between 8:00 p.m. and 3:00 a.m. The pool elevation on Lake Hamilton was 399.16 feet above sea level at 8:00 p.m. on May 19, but after four hours, had risen to 402.12 feet, and was still rising. During this time the gates on Carpenter Dam were opened in order to avoid flooding on Lake Hamilton. The combination of the discharge from Lake Hamilton and the inflow of rain from Lake Catherine's drainage area flooded the shores of Lake Catherine. The tail water from Carpenter Dam rose from a normal elevation of 305 feet, to an elevation of 331 feet by 4:00 a.m. on May 20. Before the flooding, the pool elevation at Remmel Dam was near normal at 304.33 feet, but the pool at Remmel Dam crested at 7:00 a.m. on May 20 at

---

** The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

an elevation of 317.50 feet, although all spillway gates were fully opened by 3:00 a.m.

The flowage was estimated as the highest ever known in the area, although the gauge that would have made the measurement was destroyed when the flood carried it away. The highest record of flow recorded was 140,000 cubic feet per second in 1923, and the United States geological survey, calculating from high water marks at the lost gauge's former location, estimated the flow as at least 166,000 cubic feet per second. The flood caused massive damage to the landowners' real estate around the lake and to personal property left there, since the water went up to the roofs of many houses.

The landowners held their property subject to flowage easements created by reservations in the deeds to their predecessors in title, by outright purchase from their predecessors in title, or in one case, by court decree in a condemnation case. At the time Remmel Dam was built in 1923–24 and when the project was expanded in 1947 (and even later in some cases), AP & L systematically purchased and reserved easements on all the land adjacent to Lake Catherine permitting flooding to the levels it determined could be flooded in a "worse case scenario," using a study conducted during construction of Remmel and Carpenter Dams. The language of the easements varied, but all reserved or conveyed flowage and submersion rights either to a certain elevation varying according to location along the lake, or covering the entire parcel.

The instruments fall into several general categories. First, there were easements by reservation in which AP & L conveyed property, reserving:

the right to use and to appropriate and to clear of brush and trees and other obstructions and to submerge by water, all lands lying ... below the elevation of 307 feet above mean sea level.[2] ... *It is* herein *expressly reserved,* however, *to the grantor,* its successors and assigns, *the right to flood any part of said lands by water or waters impounded by a dam* or dams now or thereafter constructed and/or maintained across the Ouachita River.... It is also expressly agreed that the grantor ... shall not be liable for damages to said lands or to other property placed on said land by reason of construction or maintenance or operation of such dam or dams....

(Emphasis added.)

The second form used is a simple reservation of "the *right at all times to flood any and all of said lands* " (emphasis added) and provides that AP & L "shall not be subject to damages on account of floods from natural or other causes...."

The third form is a grant of easement to: use, to appropriate, to clear of trees, brush and other obstructions *and to submerge by water the following* described *lands* ... these acreages being those portions of the above described tracts which would be flooded by or surrounded by *waters impounded by a dam proposed* to be constructed on the Ouachita River, when said waters are raised to an elevation [the specified elevation varies from deed to deed, ranging from elevations of 315 to 329 feet above mean sea level.]

(Emphasis added.)

One other parcel is covered by a reservation of "all flowage rights reserved [in a previous instrument] up to the 320 foot contour line."

Finally, the easement created by condemnation decree gives "the *right and privilege of overflowing said lands with water impounded by said dam,* all of the above described lands that may be overflowed with such water [those at and below 317 feet m.s.l.]." (Emphasis added.)

The landowners do not contest that the instruments creating the easements were validly recorded.

After the flood, the landowners in this appeal as well as other plaintiffs brought suit, claiming that AP & L was negligent in managing Lake Catherine's level, in that AP & L opened the gates on Carpenter Dam without opening the Remmel Dam gates at the same time. The landowners also claimed

2. The specified level varied by deed, with 307 feet being most common.

that AP & L failed to adequately warn them of the sudden inundation in order to permit them to remove their personal property from the area. Further, they claimed that Ark. Code Ann. § 15–22–210(1), imposed a duty on AP & L to protect them. Finally, the landowners argued that AP & L is estopped from flooding their land because AP & L permitted them to build improvements on the land and supplied electricity to their houses there. AP & L moved for summary judgment, relying on its easements to protect it from liability for the flooding.

The landowners presented an affidavit of an expert, Dr. Daryl B. Simons, stating that AP & L employees and agents operated the flood gates on Carpenter and Remmel dams on May 19 and 20 in a manner so as to cause the water level to rise dramatically in Lake Catherine. In Simons' professional opinion AP & L acted unreasonably and negligently in the operation of its flood gates, did not properly monitor the water levels on Lake Hamilton and Lake Catherine, and failed to coordinate the opening of the flood gates on Carpenter Dam with the opening of flood gates on Remmel Dam so as to avoid the flooding.

The district court entered partial summary judgment for AP & L, holding: "Since the sole purpose for having the easements was to allow AP & L to flood the property, plaintiffs cannot complain that the exercise of this right constitutes an illegal interference with their rights of utilization and enjoyment." *Dodd v. Arkansas Power & Light Co.,* No. 90–6055, 1991 WL 540140, slip op. at 3 (W.D.Ark. June 28, 1991). The district court in its memorandum opinion referred to Dr. Simons' affidavit but stated that it had "difficulty accepting plaintiffs' general assertion that a party can act negligently in using an easement for the precise purpose for which it is obtained." *Id.,* 1991 WL 540140, at 2. The use of the easement appeared to be consistent with the terms of the agreement, and the court concluded there was no obvious basis for the landowners' claim that AP & L was negligent. The sole purpose for having the easement was to allow AP & L to flood

the property and the landowners could not complain that the exercise of this right constituted an illegal interference with their rights of utilization and enjoyment. The court also stated that exculpatory language in the easements was not contrary to public policy, and that none of the alleged acts of AP & L was sufficient to stop it from asserting its rights under the easements. Therefore, the court entered judgment for AP & L on claims for property damages resulting from flooding lands covered by AP & L's flowage easements.

In a later clarifying order, the court stated that claims arising from damages to land lying above the elevation levels described in the easements were not affected by the earlier ruling, even if part of the plaintiff's land was at or below the relevant elevation level. On the other hand, any plaintiff whose damages resulted from flooding of land below the level covered by an easement was barred from recovery, *even if* the improvements on the property reached above the easement level and were damaged by water higher than that level. *Carvin v. Arkansas Power & Light,* No. 90–6055, 1991 WL 540481, slip op. at 4–7 (E.D.Ark. Dec. 2, 1991). In other words, if an easement extended to the 315 feet elevation, the land lay at 314 feet with a house on it, and the water rose to the roof of the house, there would be no cause of action for the flooding. Thus, the appeals before us involve damage resulting from flooding land lying at elevations covered by the easements, though the actual water level may have exceeded the level mentioned by the easement.[3]

■ We review entry of summary judgment de novo, determining whether there is any genuine issue of material fact. *Schrader v. Royal Caribbean Cruise Line, Inc.,* 952 F.2d 1008, 1013 (8th Cir.1991). We view the record in the light most favorable to the non-moving party, giving the non-moving party the benefit of any reasonable inferences that can be drawn from the underlying facts. *Id.*

■ The issue before us is one of Arkansas law. The duty of the district court, as well as ours, is to ascertain as best we can the manner in which the Supreme Court of

---

**3.** The landowners voluntarily dismissed their claims that remained live after the court's December 2 order, so that the June 28 and December 2 orders became final and appealable.

Arkansas would decide the issues before us, as it is evident that the questions before us have not been squarely resolved by the Arkansas Supreme Court. We review the question de novo, giving no deference to the views of the district court on state law, under the teaching of *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

■ Arkansas law recognizes flowage easements granting "an occasional right to flood and submerge" lands. *See Jones v. Scott,* 256 Ark. 653, 509 S.W.2d 831, 833 (1974); *Hodge v. Marmaduke,* 255 Ark. 789, 503 S.W.2d 174, 175 (1973).

■ This case involves a variety of easement forms, executed on different dates, but all with the same background. Some expressly reserved the right to "submerge" the land up to 307 feet m.s.l. and to "flood any part" of "said lands." Others conveyed the right to "flood any and all of said lands." Others granted the right to flood to a certain level, varying from 315 feet m.s.l. to 329 feet m.s.l., elevations clearly much higher than the normal lake level. Two of the three forms used, and the condemnation decree, specifically granted the right to flood the lands "by waters impounded by a dam." The language is plain and specific. The obvious purpose of the flood and flowage rights is to protect AP & L from liability from its management of the lake in circumstances such as occurred in the extremely heavy rainfall in the seven hours on May 19 and 20. When AP & L opened the flood gates during the heaviest rains experienced since the dam was built, with the resultant flooding on the property of the shores in Lake Catherine, it was exercising rights retained by it or granted to it in the documents creating the property

interest of the landowners. As in *Borders v. Alabama Power Co.,* 547 So.2d 446, 447 (Ala. 1989), we can only conclude that "[p]rotection from liability for flooding of the plaintiffs' land . . . was the very reason [the dam owner] purchased the easement." [4]

■ The landowners rely on language from Arkansas cases defining the scope of easements in terms of mutual duties on the part of the dominant and servient owners not to harm the other: "When an easement exists, the rights of both parties are reciprocal, and respective owners must use the easement in a manner that will not interfere with the other's rights to utilization and enjoyment of the property." *Bean v. Johnson,* 279 Ark. 111, 649 S.W.2d 171, 172 (1983).[5] This principle is well established in Arkansas law, *see, e.g. Davis v. Arkansas Louisiana Gas Co.,* 248 Ark. 881, 454 S.W.2d 331, 333 (1970);[6] *St. Louis Iron Mountain & S. Ry. v. Brooksher,* 86 Ark. 91, 109 S.W. 1169, 1170 (1908); *St. Louis Iron Mountain & S. Ry. v. Harris,* 47 Ark. 340, 1 S.W. 609, 610 (1886). However, the language does not give us much guidance in this case, since to apply it we must first define the nature of AP & L's "rights to utilization and enjoyment of the property," and decide whether it indeed has an unqualified right to flood or whether that right is modified by implicit restrictions or duties.

In cases using reciprocal duty language, the owner of the dominant estate has been held liable for *unnecessary* collateral damage to the servient estate, which did not follow inevitably from the purpose for which he procured the easement. In *Brooksher,* a railroad had obtained a right-of-way over the plaintiffs' property by an instrument specifically permitting the railroad "the right of

---

4. We reject the landowners' argument that the easements are themselves nothing more than exculpatory agreements designed to protect AP & L from liability. Our review of the instruments leads us to conclude that they are written both to convey a property interest and to protect AP & L from liability. The easements are not limited to the exculpatory purpose and, therefore, a deficiency in the exculpatory language will not, by itself, invalidate the underlying property interest.

5. *Bean* involved a dispute over a road on Johnson's property which was the only means of

access to the Beans' property, and specifically whether the Beans were entitled to allow "social invitees" to use the road without being accompanied.

6. *Davis* dealt with a right-of-way across pasture lands. In constructing a pipeline across the right-of-way, the easement holders cut fences and left gates open allowing registered cattle to stray onto another pasture, and a bull to fall into a ditch on the right-of-way.

changing water courses" on the property in connection with the right-of-way. 109 S.W. at 1169. The railroad built its roadbed across a creek and in so doing diverted a stream, damaging the plaintiffs' land. The court observed that the railroad's engineer stated broadly that "the company could, if it had seen fit, have let the water through without diverting it by constructing either a bridge or trestle or a culvert running with the stream." *Id.* at 1170. The court stressed the fact that the change in the course of the stream was caused unnecessarily. The court made clear that it would not have subjected the railroad to conditions that would have impaired the usefulness of the easement.

*Harris* is another case in which a farmer's land was flooded as the result of a construction of a railroad. Harris had granted a right-of-way to build the road which conveyed "the right of changing water courses and taking water." The construction of the road diverted a stream onto Harris' land. The court stated: "Injuries done in the construction of the road, for which the grantor in such a case is precluded from recovering, are those to which he has expressly assented, or is presumed to have assented, in the execution of his grant." 1 S.W. at 609. The sentence we quote above is particularly significant, for the instruments before us expressly grant or assent to the flooding of the lands, and in two of the instruments, to flooding of the lands by waters impounded by a dam.

While it is true that these cases have the common theme of the reciprocal obligations between the dominant and servient estates created by an easement, the cases are so dissimilar factually that they are of little help to us in applying their principle to the parties in this case.

■ In this case, capacity to store excess water in an emergency is the right AP & L purchased and it inevitably means flooding the land surrounding the lake, and doing so under emergency conditions—that is, sud-

denly. The kind of flooding that occurred May 19 and 20 was not an unnecessary collateral result of the privilege granted by the easement, but was instead the very privilege granted by the easement. The landowners would require that we construe the easements so as to nullify them.

■ The landowners also rely on negligence cases holding that the owner of a flowage easement must exercise due care in using his easement.[7] *See Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 668–69 (9th Cir.1955); *Satterwhite v. West Central Texas Mun. Water Dist.,* 737 S.W.2d 98, 100 (Tex. Ct.App.1987). Though these cases approach the problem using a tort rather than property law analysis, they arrive at the same result as the Arkansas cases we have just discussed, for in *Griffeth* and *Satterwhite* the courts approved a directed verdict and summary judgment, respectively, for defendant dam owners who flooded lands subject to flowage easements. Both cases support the notion that an easement holder does not commit negligence in doing exactly what his easement permits. Some additional negligence must be shown and both *Griffeth* and *Satterwhite* held that the plaintiffs failed to prove such negligence.

Appellants refer to the failure of AP & L to warn of the flooding, but do not develop this as an independent basis of liability. We are aware that the Fifth Circuit in *Ford Motor Company v. Dallas P & L Co.,* 499 F.2d 400 (5th Cir.1974), concluded under Texas law that there was a duty to warn, but the facts in that case differ significantly from those before us. There was evidence in *Ford* that on two occasions calls were made to the Power Company inquiring about the release of water and the company refused to answer.

To apply the law of negligence as plaintiffs urge would thus deprive AP & L of the essential benefit of its easements, a result we believe exceeds the mandate of the cases plaintiffs rely on.

---

7. The landowners also cite *Kunz v. Utah Power and Light Co.,* 526 F.2d 500 (9th Cir.1975), which as the district court pointed out, *Dodd,*

1991 WL 540140, slip op. at 4, is distinguishable from this case, since its holding depends on the dam owner voluntarily undertaking to provide

The landowners cite a California case, *Salton Bay Marina, Inc. v. Imperial Irr. Dist.*, 172 Cal.App.3d 914, 218 Cal.Rptr. 839 (1985), in which a court found that certain flowage easements were intended only to protect the easement owner from liability for *natural* flooding, but that if they were not so limited, they would be illegal exculpatory clauses violating public policy. 218 Cal.Rptr. at 848–49. We need not ascertain what result *Salton Bay* would lead to in this case, since it depends on a view of public policy regarding exculpatory clauses that differs from the approach Arkansas courts have taken. *See generally Dessert Seed Co. v. Drew Farmers Supply, Inc.*, 248 Ark. 858, 454 S.W.2d 307, 310–11 (1970).

The landowners' reliance on duties imposed on AP & L under Ark.Code.Ann. § 15–22–210(1) does not supply us with a basis for jurisdiction, since the remedy under that statute lies in proceedings before the Arkansas Soil & Water Conservation Commission. *See Styers v. Johnson*, 19 Ark.App. 312, 720 S.W.2d 334, 337 (1986).[8]

Finally, we agree with the district court that nothing AP & L was alleged to have done estops it from relying on its flowage easements. *Dodd*, 1991 WL 540140, slip op. at 7–8.

The issues in this case are extremely close. The loss of property is most substantial and the result seems harsh. Yet we do deal with property, and we deal with those documents creating property interests which expressly created in AP & L the right to flood the land. We couple this with an extremely heavy rainfall, indeed the heaviest recorded in at least sixty-three years. In view of the property interest created by the documents involving each of the landholders, we cannot place liability on AP & L in such circumstances.

We have pondered carefully the possibility of a decision contrary to that we now reach, but to sustain the claims asserted by the landowners would require that we in large part accept language and dicta in the several cases discussing the reciprocal rights between dominant and servient landholders and essentially ignore the extent of the holding in those cases. While the issue is close, we conclude that the interests in property are no greater than those instruments that created the property interest, and accordingly the claims for damage to that real property and the personalty thereon must fail because of these restrictions.

We affirm the judgment of the district court.

---

flood control for the area, a fact absent in this case.

**8.** The landowners try to resurrect their statutory duty argument in another guise by contending that section 15–22–210(1) imposes on AP & L a duty to the public that cannot be waived under *Dessert Seed*, 454 S.W.2d at 310–11. *Dessert Seed*, at the most, could only obviate an exculpatory clause raised as an affirmative defense to a cause of action (here, an action based on negligence). Our earlier holding that the landowners have no negligence cause of action renders it unnecessary to evaluate possible defenses.