

DA 07-0353

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 286

REBECCA E. MATTSON, SLITERS, NORTH FLATHEAD LAKE YACHT
CLUB, J. MICHAEL DOCKSTADER, RAY J. HABEL, GREG R. HABEL,
WILLIAM G. BOWD, PAUL & MARY SULLIVAN, RAY & MAUREEN HEIN,
RANDA J. MCALPIN, NEIL R. MCALPIN, PETE C. WOLL, LOYD
FOSTER, G.W. INGHAM II, BENJAMIN W. LOUDEN, L. HARRY WOLL,
KENNETH D. LOUDEN, MICHEL O. SPECKERT, STEVEN SPECKERT,
SUSIE SPECKERT, HECTOR SPECKERT, JOHN DOES 1-500,
JANE DOES 1-500, ABC CORPORATIONS 1-500, XYZ
PARTNERSHIPS 1-500, DEF LIMITED LIABILITY COMPANIES, 1-500, and
all other parties similarly situated,

        Plaintiffs, Appellants and Cross-Appellees,

    v.

MONTANA POWER COMPANY, a Montana Corporation, PPL MONTANA,
LLC, a Delaware Limited Liability Company, TOUCH AMERICA
HOLDINGS, INC., a Delaware Corporation, MONTANA POWER, LLC,
a/k/a NORTHWESTERN ENERGY, a South Dakota Limited Liability
Company, and NORTHWESTERN CORPORATION, a South Dakota
Corporation,

        Defendants, Appellees, and Cross-Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV 1999-548A
                Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Thomas R. Meites, Jamie S. Frankin, Meites, Mulder, Mollica
        & Glink, Chicago, Illinois

        James P. Molloy (argued), Molloy Law Firm, Helena, Montana

        Larry M. Elison, Gold Canyon, Arizona

        Calvin T. Christian, Christian, Samson, Jones & Chisolm,
        Missoula, Montana

For Appellees:

Martin S. King (argued), Sean M. Morris (argued), Worden, Thane, P.C., Missoula, Montana

_____

Argued:  September 24, 2008
Submitted:  November 18, 2008
Decided:   August 25, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Flathead Lake, located in northwest Montana, is the largest natural freshwater lake west of the Mississippi. It is 28 miles long and 15 miles wide (at its broadest points) and covers 191 square miles. Its two primary tributaries are the upper Flathead River and the Swan River, which enter from the north and east. The lake drains to the south into the lower Flathead River. In the 1930s, Montana Power Company (MPC) constructed Kerr Dam on the lower Flathead River 4.5 miles downstream of the lake's natural outlet. The dam regulates Flathead Lake's water level and generates electrical power for customers in Montana. MPC managed and operated Kerr Dam until December 1999, when it conveyed its interest to PPL Montana, LLC (PPLM). PPLM has operated the dam since.

¶2 In November 1999, a group of landowners owning real property on the shores of Flathead Lake and the southern banks of the upper Flathead River (Landowners) commenced the instant action in the Eleventh Judicial District Court, Flathead County, on behalf of themselves and similarly situated landowners[1] against MPC and PPLM.[2] In due course, the Landowners filed motions to certify the lawsuit as a class action. The District Court granted the motions and certified the following class:

---

[1] The named plaintiffs are Rebecca E. Mattson, Sliters, North Flathead Lake Yacht Club, J. Michael Dockstader, Ray J. Habel, Greg R. Habel, William G. Bowd, Paul & Mary Sullivan, Ray & Maureen Hein, Randa J. McAlpin, Neil R. McAlpin, Pete C. Woll, Loyd Foster, G.W. Ingham II, Benjamin W. Louden, L. Harry Woll, Kenneth D. Louden, Michael O. Speckert, Steven Speckert, Susie Speckert, Hector Speckert, John Does 1-500, Jane Does 1-500, ABC Corporations 1-500, XYZ Partnerships 1-500, DEF Limited Liability Companies 1-500, and all other parties similarly situated.

[2] The Landowners also named Touch America Holdings, Inc., Montana Power, LLC, a/k/a NorthWestern Energy, and Northwestern Corporation as defendants, alleging that these three entities are successors to MPC (pursuant to a restructuring that occurred in 2002) and, as such, are liable for MPC's alleged wrongdoing.

All persons and entities (other than Defendants and the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana) that own real property either with frontage on the shoreline of Flathead Lake in Flathead County or Lake County, Montana, or which contains a bank of the Flathead River located in Flathead County, Montana, or both.

¶3 The Landowners claim that the manner in which MPC and PPLM have operated Kerr Dam has resulted in continuous erosion, loss of shoreline, and damage to their properties. They contend that the erosion and damage are caused primarily by MPC's and PPLM's practice each year of maintaining Flathead Lake's water level at full pool (i.e., at the highest permitted elevation) into the fall storm season. In response, PPLM points out that the Landowners' properties are subject to easements, obtained from shoreline property owners in the 1930s, '40s, and '50s, which allow the operator of Kerr Dam to flood, subirrigate, drain, or otherwise affect the Landowners' properties with the waters of Flathead Lake. The Landowners argue, however, that MPC and PPLM have acted outside the scope of these easements. They assert claims of trespass, nuisance, a taking of property, and breach of the easements.

¶4 Recognizing that the easements might pose a "legal barrier" to the Landowners' claims, the parties filed cross-motions for summary judgment on the easements' legal effect. The District Court ultimately rejected the Landowners' argument that the dam operator may not use, invade, or affect their properties above an elevation of 2,893 feet and concluded instead that the easements "cover entire parcels." The court also ruled that erosion, including "wave action" erosion, is within the scope of the easements. Finally, the court concluded that any duty PPLM has not to cause unreasonable damage to the Landowners' properties applies only to damage unrelated to the use of the easements.

4

¶5 The Landowners now appeal from the District Court's order granting summary judgment in favor of all defendants, while PPLM cross-appeals from the District Court's order certifying this lawsuit as a class action as to PPLM. The parties present four issues, which we restate as follows:

1. Are the easements restricted in scope by a limiting contour line around Flathead Lake at 2,893 feet above mean sea level?

2. Is the operator of Kerr Dam allowed under the easements to cause erosion to the Landowners' properties?

3. Is the operator of Kerr Dam required not to cause unreasonable damage to, or interfere unreasonably with the enjoyment of, the Landowners' properties?

4. In evaluating the Landowners' motion for class certification, was the District Court required to take all of their allegations "as true"?

¶6 As detailed below, we conclude that the easements are not restricted by a limiting "contour line" around Flathead Lake; rather, they extend to those parts of the Landowners' properties which are "affected" when the lake's water level is at 2,893 feet above mean sea level as measured at Kerr Dam. We further conclude that the easements include an incidental right to cause reasonably necessary erosion to the Landowners' properties. However, we hold that the dam operator is not entitled to cause unreasonable damage to those properties or interfere unreasonably with the enjoyment of those properties. Finally, with respect to the cross-appeal issue, we hold that the District Court erred in taking all of the Landowners' allegations "as true." We accordingly affirm in part, reverse in part, and remand for further proceedings.

5

## ADDITIONAL BACKGROUND

¶7     In 1930, the Federal Power Commission issued Rocky Mountain Power Company (RMPC, a subsidiary of MPC) a 50-year license to construct and operate a dam on the lower Flathead River. RMPC transferred the license to MPC in 1938. Construction of Kerr Dam commenced in 1930 but then was delayed due to the Great Depression. The dam was finally completed in 1938, and commercial operations began in 1939.

¶8     Kerr Dam and the southern half of Flathead Lake are located within the exterior boundaries of the Flathead Indian Reservation. In 1976 (four years before the expiration of the original license), MPC and the Confederated Salish and Kootenai Tribes of the Flathead Reservation filed competing applications for a new license to operate the Kerr Project (the dam, the reservoir, and appurtenant facilities). They eventually reached a settlement under which a new 50-year license would issue to MPC and the Tribes jointly, and MPC would hold and operate the project for the first 30 years of the term, at which point the Tribes would have the option of taking over the project upon payment of a specified sum to MPC. The Federal Energy Regulatory Commission approved the settlement and issued the joint license in July 1985. *See Montana Power Co.*, 32 F.E.R.C. ¶ 61,070 (1985). The dam is presently operated under this license.

¶9     Flathead Lake is fed by snowmelt and by releases from Hungry Horse Dam on the South Fork of the upper Flathead River.[3] Prior to the construction of Kerr Dam, the lake's water level rose an average of eight feet each year from mid-April to early June due to spring runoff. The average peak elevation was 2,890 feet above mean sea level.

---

[3] Hungry Horse Dam was completed in 1953.

The water level then dropped steadily during the summer to a base level where it would remain until the following spring. Under Kerr Dam operations, however, the lake rises to an elevation some three to four feet above the average pre-dam peak and is maintained at this level into October. It is then lowered gradually over the winter to an elevation two or three feet above the pre-dam base level, after which spring runoff begins the cycle anew.

¶10 The 1930 and 1985 dam licenses authorize the dam operator to regulate Flathead Lake between elevations 2,883 and 2,893 feet above mean sea level. In this connection, Frank M. Kerr (RMPC's vice president and general manager at the time) testified before the Federal Power Commission in October 1929 concerning RMPC's application to develop power on Flathead Lake and the Flathead River. He acknowledged that there had been "a good deal of controversy and discussion as to the effect of high water in the lake" and that a great deal of study had been conducted on the subject. Noting that "no one wants to buy or pay for any damage that can possibly be avoided," Kerr testified that

> the result of these things that I have described has indicated to us as businessmen and as engineers that the elevation 2,893 is the logical development in the interest of everyone that may be concerned. Unquestionably this takes some land, but nothing of importance except at the north end of the lake, where the delta of the Flathead River has made a large area very flat.

Kerr further testified that he had been

> asked the question many times as to what effect this storage at 2,893 will have upon the lake shore in general, and in order to use an expression that I thought would be best understood by a layman, I have said to these people that "If you will build or do anything on your property in the light of your experience as to what elevations of the lake have prevailed heretofore, you will in no way be affected by the new conditions."

¶11    In 1962, MPC and the U.S. Army Corps of Engineers entered into a Memorandum of Understanding which specified procedures for the regulation of Flathead Lake in the interests of flood control, recreational needs, and power-production needs. As amended in 1965, the Memorandum provides that, conditions permitting, the lake will be drawn down to elevation 2,883 feet by April 15 and then raised to elevation 2,890 feet by Memorial Day and to elevation 2,893 feet by June 15. The Memorandum also provides that when the lake reaches elevation 2,886 feet in a moderate or major flood year, the dam operator will gradually open the spill-gates to maintain free flow and will not close the gates until after the danger of exceeding elevation 2,893 feet has passed. The Federal Power Commission subsequently approved these procedures, *see Montana Power Co.*, 35 F.P.C. 250 (1966), and the Federal Energy Regulatory Commission incorporated the Memorandum of Understanding into the 1985 license issued jointly to MPC and the Tribes. PPLM reports that Kerr Dam has been operated in substantially the same manner since 1938 and in accordance with the Memorandum of Understanding since 1962.

¶12    As explained above, Flathead Lake under pre-dam conditions reached its peak in early June and then dropped steadily during the summer to its base level, whereas now the lake is maintained at full pool (elevation 2,893 feet) into early October. There is no question that this practice impacts shoreline properties. In fact, RMPC anticipated as much. In a September 1937 letter to the Federal Power Commission, RMPC stated that holding the lake at 2,893 feet for longer time intervals than those which usually prevailed under pre-dam conditions would "affect" lake borderlands and could, for instance, cause "waterlogging of lands beyond the conventional project boundary."

8

¶13    The Landowners' contend, however, that maintaining the lake at full pool into October has caused (and will continue to cause) substantial damage to their properties. In particular, they assert that the shoreline of Flathead Lake and the upper Flathead River is "continuously being eroded" and "undercut" by such operation of Kerr Dam, resulting in an "ever-widening footprint" of the lake.[4] They explain that erosion is more severe during storms, that storms are stronger in the fall, and that the presence of higher-than-normal waves during fall storms produces substantial shoreline erosion and property damage. Thus, the Landowners claim that most of the damage to their properties takes place in the fall when the lake is artificially held at or near 2,893 feet. In response, PPLM characterizes the Landowners' contentions about the extent of shoreline erosion as "an exaggeration." According to PPLM, "the majority of the Lake is at equilibrium and is not affected by the operation of Kerr Dam." PPLM claims that only five properties are affected to any great extent by PPLM's regulation of the lake's water level. Moreover, PPLM maintains that its operation of the dam is within the scope of the flood easements and that it is not liable, therefore, for the Landowners' claimed damages.

¶14    As noted, RMPC and MPC began securing these easements from shoreline property owners in the late 1930s, and this process continued into the 1940s and '50s. Notably, MPC purchased a significant number of the easements for nothing more than the $1.00 consideration stated in the printed contract. Although the language of the assorted easement contracts varies to some extent, they all give MPC and its successors

---

[4] According to one of the Landowners' consultants, erosion has occurred on all of the lake's shores, except those composed of bedrock, and is most severe near the mouth of the upper Flathead River, with annual land losses there of 40 to 50 feet.

the perpetual right and easement for flooding, subirrigating, draining, or otherwise affecting with the waters of Flathead Lake and its tributaries all or any part of the hereinabove described lands which are, will or may be affected by the regulation and control of the waters of Flathead Lake by the construction, maintenance and operation of a dam and hydroelectric power development in the Flathead River below said lake, which dam is designed to control and regulate the waters of Flathead Lake at varying elevations, not exceeding a maximum controlled water level of 2893 feet, U.S.G.S. datum, at said dam.

The parties agree that the viability of the Landowners' claims against MPC and PPLM depends in large part on the interpretation of the foregoing language.

## STANDARDS OF REVIEW

¶15 We review de novo a district court's ruling on a motion for summary judgment, applying the criteria set forth in M. R. Civ. P. 56. *Arnold v. Yellowstone Mountain Club, LLC*, 2004 MT 284, ¶ 12, 323 Mont. 295, 100 P.3d 137. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). We review a district court's conclusions of law de novo to determine whether those conclusions are correct. *Babcock v. Farmers Insurance Exchange*, 2000 MT 114, ¶ 5, 299 Mont. 407, 999 P.2d 347.

## DISCUSSION

¶16 An easement is a nonpossessory interest in land—a right which one person has to use the land of another for a specific purpose or a servitude imposed as a burden upon the land. *Blazer v. Wall*, 2008 MT 145, ¶ 24, 343 Mont. 173, 183 P.3d 84. An easement cannot be created except by an instrument in writing, by operation of law, or by

10

prescription. *Blazer*, ¶ 26. Here, the easements were created by written instruments. Most are express grants by shoreline property owners, although some are reservations by MPC when conveying its own shoreline properties.

¶17 Where an easement is specific in nature, the breadth and scope of the easement are determined by the actual terms of the deed. In other words, if the grant or reservation is specific in its terms, it is decisive of the limits of the easement. *Guthrie v. Hardy*, 2001 MT 122, ¶ 46, 305 Mont. 367, 28 P.3d 467; *accord* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 8:2, 8-4 (2009) ("When precise language is employed to create an easement, such terminology governs the extent of usage."). In contrast, where the grant or reservation is general in its terms, courts must look beyond the language of the deed in determining the breadth and scope of the servitude, which need only be such as is reasonably necessary and convenient for the purpose for which the easement was created. *Guthrie*, ¶ 47; *see also* § 70-17-106, MCA. Here, the Landowners and PPLM contend, and we agree, that the easements are specific, as they specifically define the dam operator's usage right as "flooding, subirrigating, draining, or otherwise affecting" certain parts of the Landowners' properties.

¶18 The construction of a writing granting an interest in real property is governed by the rules of contract interpretation. *Mary J. Baker Revoc. Trust v. Cenex Harvest States*, 2007 MT 159, ¶ 18, 338 Mont. 41, 164 P.3d 851; *accord Wills Cattle Co. v. Shaw*, 2007 MT 191, ¶ 19, 338 Mont. 351, 167 P.3d 397; § 70-1-513, MCA. The construction and interpretation of a contract is a question of law. *Baker Revoc. Trust*, ¶ 19. A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed

at the time of contracting, so far as the same is ascertainable and lawful. Section 28-3-301, MCA. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible. Section 28-3-303, MCA. The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other. Section 28-3-202, MCA. The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. Section 28-3-401, MCA. Evidence of the circumstances under which the contract was made and the matter to which it relates may be considered. Sections 28-3-402, 28-2-905(2), 70-20-202(2), MCA; *see also Baker Revoc. Trust*, ¶ 47 & n. 5. However, such evidence is not admissible to add to, vary, or contradict the terms of the contract. *See* §§ 28-2-904, 28-2-905(1), 70-20-202(1), MCA; *Baker Revoc. Trust*, ¶ 21.

¶19     With these principles in mind, we turn to the Landowners' contentions.

## Issue 1

¶20     ***Are the easements restricted in scope by a limiting contour line around Flathead Lake at 2,893 feet above mean sea level?***

¶21     As noted, the easement contracts give MPC and its successors the right to flood, subirrigate, drain, or otherwise affect with the waters of Flathead Lake and its tributaries all or any part of the Landowners' properties which are or may be affected by the regulation and control of Flathead Lake by Kerr Dam, "which dam is designed to control and regulate the waters of Flathead Lake at varying elevations, not exceeding a maximum controlled water level of 2893 feet, U.S.G.S. datum, at said dam." The parties dispute the

12

significance of this "2893 feet" clause.[5] The Landowners reason that because the maximum "controlled" water level is specified as 2,893 feet, the easements do not extend to land lying above this elevation at the time the easements were created. In other words, the Landowners argue that there is a height limit or "contour line" around Flathead Lake at 2,893 feet and that the dam operator may not allow the lake's waters to invade or affect their properties above this elevation. In PPLM's view, however, "2893 feet" merely "describes the design" of the dam. According to PPLM, each flood easement encumbers "the entire parcel." The District Court agreed with PPLM on both of these points. Alternatively, PPLM argues that even if "2893 feet" is not a "description" of the dam, it still is not a contour line; rather, it is a limitation on the lake level as measured *at the dam*, not at every point around the lake.

¶22    We agree with the Landowners that the "2893 feet" clause limits the scope of PPLM's easement, but we agree with PPLM that it does not create a "contour line" around the lake. Again, the right to flood, subirrigate, drain, or otherwise affect shoreline properties extends to

> all or any part of the hereinabove described lands *which are, will or may be affected by the regulation and control of the waters of Flathead Lake by [Kerr Dam]*, which dam is designed to control and regulate the waters of Flathead Lake at varying elevations, not exceeding a maximum controlled water level of 2893 feet, U.S.G.S. datum, *at said dam.* [Emphases added.]

¶23    Reading these terms together so as to give effect to every part, each clause helping to interpret the other, as we are required to do (§ 28-3-202, MCA), we reject PPLM's

---

[5] PPLM also points out that some of the easement contracts do not refer to "2893 feet" in the granting provision itself. However, PPLM does not deny that it is bound to operate the dam consistently with those contracts which do refer to "2893 feet."

proposition that it has a boundless right to flood "the entire parcel" of every Landowner. In arguing this interpretation of the easements, PPLM ignores the "affected by" clause and treats the "2893 feet" clause as a superfluous point of interest. Taken as a whole, the easement language reflects that the grantors conveyed the right to flood, subirrigate, drain, or otherwise affect only that part of their parcels which may be "affected" when the water level of Flathead Lake is regulated at a maximum controlled elevation of 2,893 feet at Kerr Dam. Some parcels may be "affected" entirely when the water level is at this elevation, while others may not be "affected" at all. But again, the dam operator's right extends to only those parts of the parcels which are "affected" when the water level is at 2,893 feet at the dam.[6] Hence, dam-related effects to the Landowners' properties which occur because the water level is regulated at the dam above an elevation of 2,893 feet would be beyond the scope of the easements.

¶24 Conversely, nothing in the easement language establishes a limiting contour line or ceiling at 2,893 feet above mean sea level on each Landowner's parcel such that all "flooding, subirrigating, draining, or otherwise affecting" must occur below this elevation. The language states that the maximum controlled water level is 2,893 feet "at said dam"—a critical qualifier the Landowners apparently disregard. There is no stated limitation of 2,893 feet around the entire shoreline. Indeed, the easement language contemplates that "all or any part of" a given shoreline parcel may be "affected" when the water level is raised to an elevation of 2,893 feet at the dam. Thus, while the water level may on occasion exceed 2,893 feet at other points around the lake, as the

---

[6] The term "affected" is subject to constraints discussed under Issues 2 and 3.

14

Landowners claim, and while MPC and PPLM may have "affected" various shoreline properties at points on those properties above an elevation of 2,893 feet, as the Landowners also claim, such events are permitted by the easement language when the water level is regulated at the dam at an elevation of 2,893 feet or less.

¶25    *Rutledge v. Union Electric Co.*, 280 S.W.2d 670 (Mo. 1955), cited by PPLM, does not alter our interpretation of the easement language.  The deed at issue in that case granted "unlimited flowage rights" to "back water over or under, submerge, flood or otherwise damage said tracts or parcels of land through backwater or otherwise, whether caused by flooding, erosion, seepage ground water, lack of drainage, obstructed drainage, or in any manner whatever, resulting from the construction, operation and maintenance of the dam."  *Rutledge*, 280 S.W.2d at 671, 673.  The deed also stated that "[s]aid dam, power house and works appurtenant thereto shall be designed to hold the water level at the dam at approximately 660 feet above mean sea level," but it did not state a *maximum* elevation of water at the dam.  *Rutledge*, 280 S.W.2d at 671.  Indeed, the court held that the "approximately 660 feet" reference was to the *normal* lake level and that Union Electric had the right under the deed to flood the plaintiffs' land "to *any* height." *Rutledge*, 280 S.W.2d at 673.  Here, by contrast, 2,893 feet is the stated "maximum controlled water level" at the dam, and the dam operator's flowage rights are limited to those parts of the Landowners' properties which are "affected" when the lake is brought up to this level.

¶26    But the Landowners argue that if the "2893 feet" clause is not interpreted as a vertical limit on PPLM's right to use and affect their properties, then PPLM could expand

15

the surface area of Flathead Lake indefinitely at the expense of shoreline property owners by undercutting and eroding away their properties. They assert that such expansion has occurred over the past several decades and that, as a result, the 2,893-foot contour line around the lake is wider now than it was in the 1930s. The Landowners maintain that their predecessors did not agree to this "ever-expanding taking" of shoreline property.

¶27 In essence, the Landowners argue that any interpretation of the easement language under which shoreline property owners granted MPC the perpetual right to flood and erode their properties entirely, thereby rendering those properties permanently submerged and unusable for customary purposes, would be absurd. *See* § 28-3-301 and -401, MCA (respectively, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting," and "[t]he language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity"). We agree that interpreting the contract language to grant such a right would involve an absurdity insofar as Kerr Dam is operated unreasonably. Indeed, as to the effect that an artificially maintained water level of 2,893 feet would have on the lakeshore, Frank M. Kerr told these people prior to the construction of the dam: "If you will build or do anything on your property in the light of your experience as to what elevations of the lake have prevailed heretofore, you will in no way be affected by the new conditions." As noted above, the lake's average pre-dam peak elevation was 2,890 feet, and the water level dropped steadily during the summer to roughly 2,882 feet, where it would remain until the following spring. In light of these circumstances, which we may consider (§§ 28-3-402, 70-20-202(2), MCA), the property owners certainly did not

16

intend to grant, and MPC did not intend to obtain, an unfettered right to sink their properties completely and permanently into the lake.

¶28 At the same time, however, MPC did not guarantee, and the property owners could not reasonably expect, that there would be no damage at all to their properties resulting from the dam operator's exercise of its easement right over the years. Indeed, the Landowners are not challenging erosion that occurs in the course of flooding their properties in the spring and draining the water off during the fall and winter. The "ever-expanding taking" of which they complain occurs not simply because the lake level is raised to 2,893 feet at the dam, but because it is kept at full pool into the fall storm season when shoreline erosion is most significant—a practice which the Landowners contend causes unnecessary and unreasonable damage to their properties. Thus, construing the "2893 feet" clause as we have to be a limitation on the water level *at the dam*, as opposed to a limiting contour line *around the lake*, does not of its own force create an absurdity. Rather, construing the easement language to grant a right to use the Landowners' properties in a manner that is not reasonably necessary or to cause unreasonable erosion and damage to those properties by maintaining the lake at full pool into the fall storm season would create the absurdity. These considerations, however, are addressed below under Issues 2 and 3, respectively. Suffice it to say, for purposes of the present discussion, that the "2893 feet" clause does not establish the vertical limit argued by the Landowners. While the dam operator's right to flood, subirrigate, drain, or otherwise affect shoreline parcels is not unlimited, it is not restricted to a maximum elevation of 2,893 feet at each parcel. Rather, it extends to whatever parts of those parcels are

17

"affected" when the level of Flathead Lake is held at 2,893 feet above mean sea level as measured at Kerr Dam.

¶29     We accordingly affirm the District Court's conclusion that the defendants are entitled to summary judgment on the Landowners' "contour line" theory.

**Issue 2**

¶30     ***Is the operator of Kerr Dam allowed under the easements to cause erosion to the Landowners' properties?***

¶31     The Landowners contend that even if the "2893 feet" clause does not establish a limiting contour line around the lake, the easement contracts still do not allow MPC and PPLM to cause erosion to their properties, particularly the type and quantity of erosion that allegedly has occurred here—namely, undercutting caused by a combination of artificially high lake levels and the presence of higher waves during fall storms.

¶32     The relevant easement language grants "the perpetual right and easement for flooding, subirrigating, draining, or otherwise affecting" the Landowners' properties with the waters of Flathead Lake and its tributaries. The Landowners point out that "eroding" is not listed. Furthermore, with respect to the term "otherwise affecting," they invoke *ejusdem generis*, a canon of construction holding that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Black's Law Dictionary* 594 (Bryan A. Garner ed., 9th ed., West 2009); *see also Circuit City Stores v. Adams*, 532 U.S. 105, 114-15, 121 S. Ct. 1302, 1309 (2001) (" '[T]he general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' ").

18

The Landowners argue that under *ejusdem generis*, "otherwise affecting" includes only those actions which are similar in nature to "flooding," "subirrigating," and "draining" and that "eroding" is outside this class.

¶33  For its part, PPLM acknowledges that "eroding" is not expressly listed in the easement language and that "otherwise affecting" may be limited to things similar in nature to flooding, subirrigating, and draining.  But PPLM argues that erosion is a consequence of flooding, subirrigating, and draining and is, therefore, within the scope of the easements.  In other words, PPLM maintains that erosion which necessarily occurs in the course of "flooding, subirrigating, draining, or otherwise affecting [the Landowners' properties] with the waters of Flathead Lake and its tributaries" is permitted under the easement contracts.

¶34  We have applied the doctrine of *ejusdem generis*, which is longstanding in our caselaw, to constitutional provisions, statutes, and written instruments.[7]  Before the

---

[7] *See e.g. City of Kalispell v. School Dist. No. 5*, 45 Mont. 221, 230, 122 P. 742, 744-45 (1912) ("public places" in the list "streets, alleys and public places" did not include public school property); *McLaughlin v. Bardsen*, 50 Mont. 177, 188, 145 P. 954, 956 (1915) ("other excavation" in the list "shaft, drift, prospect hole or other excavation" did not include the sewer trench in question); *Thaanum v. Bynum Irr. Dist.*, 72 Mont. 221, 225-27, 232 P. 528, 530 (1925) ("other subdivision of the state" in the list "nor any county, city, town, municipality, nor other subdivision of the state" did not include the irrigation district); *In re Transp. of School Children*, 117 Mont. 618, 621, 161 P.2d 901, 902 (1945) ("other work" in the list "building, furnishing, repairing, or other work" did not include transporting pupils); *Walter v. Bd. of R.R. Commrs.*, 153 Mont. 384, 388, 457 P.2d 479, 482 (1969) ("merchandise and commodities" in the list "heavy equipment, tractors, power shovels, merchandise and commodities" did not include petroleum products); *In re Estate of Donovan*, 169 Mont. 278, 282-83, 546 P.2d 512, 514-15 (1976) ("all my personal effects" in the list "my sewing table, Zenith Color Television set, three pieces of White Samsonite luggage, costume jewelry, cut glass vase and pitcher, all my personal effects and clothes" did not include the expensive jewelry at issue).

19

doctrine can have application, the general words must be associated with the specific words, *Burke v. Sullivan*, 127 Mont. 374, 378, 265 P.2d 203, 205 (1954), a requirement that is clearly met here, as "otherwise affecting" is directly associated with "flooding, subirrigating, draining." Hence, we interpret the general term "otherwise affecting" to include only items of the same class as those three specific terms.

¶35   At the time the easement contracts were executed, "flood," "subirrigate," and "drain" were defined as follows:

> flood: "1. To overflow; inundate; deluge; as, the river *flooded* the valley.  2. To cause or permit to be inundated; to fill or cover with water or other fluid; as, to *flood* arable land for irrigation; . . . ." *Webster's New International Dictionary of the English Language* 970 (2d ed. 1934). "An inundation of water over land not usually covered by it." *Bouvier's Law Dictionary* vol. 2, 1247 (8th ed. 1914).

> subirrigate: "To irrigate below the surface, as by a system of underground porous pipes. *Webster's New International Dictionary* 2509. irrigate: "To subject to irrigation; of land, to supply with water by causing a stream to flow upon, over, or through it, as in artificial channels; to water." *Webster's New International Dictionary* 1313. irrigation: "The operation of watering lands or causing water to flow over lands by artificial means . . . ." *Bouvier's Law Dictionary* vol. 2, 1683.

> drain: "1. To draw off by degrees; to cause to flow gradually out or off; to draw off utterly; as, to *drain* water from a tank; hence, to cause the exhaustion of. . . . 2. To exhaust of liquid contents by drawing them off; to make gradually dry or empty; to remove surface water from, as streets, by gutters, etc.; . . . ." *Webster's New International Dictionary* 782. "To conduct water from one place to another, for the purpose of drying the former." *Bouvier's Law Dictionary* vol. 1, 939.

¶36   The question is whether "erode" is in the same class as these terms. We conclude it is not. Whereas "flood," "subirrigate," and "drain" involve the placement or removal of water, "erode" contemplates the gradual destruction or wearing away of something:

> erode: "To eat into or away; to destroy by slow disintegration . . . ; specif., *Geol. & Phys. Geog.*, to wear away, as land by the action of water; . . . ." *Webster's*

20

*New International Dictionary* 869. erosion: "The gradual eating away of the soil by the operation of currents or tides." *Bouvier's Law Dictionary* vol. 1, 1068.

To wear or eat away something, such as land, is not in the same class as to move water from one location to another. While erosion may be a *consequence* of flooding, subirrigating, and draining, it is not similar in nature to those actions. Accordingly, the right to erode is not included in the term "otherwise affecting."

¶37 This conclusion does not end our analysis, however, as PPLM contends, and we agree, that the right to erode is incident to the right to flood, subirrigate, and drain. This Court long ago recognized "the maxim of the law, that when the use of a thing is granted, everything is granted by which the grantee may reasonably enjoy such use, that is, rights that are incident to something else granted." *Laden v. Atkeson*, 112 Mont. 302, 306, 116 P.2d 881, 884 (1941); *accord Sullivan v. Donohoe*, 191 N.E. 364, 365 (Mass. 1934) ("When an easement or other property right is created, every right necessary for its enjoyment is included by implication."); *see also e.g. Carbon County v. Union Reserve Coal Co.*, 271 Mont. 459, 473, 898 P.2d 680, 689 (1995) ("[T]he transfer of a mineral interest includes, by implication, the incidental rights reasonably necessary to extract the mineral."). The rule that conveyances include those rights necessary to make use of the property conveyed can be traced back in the common law at least as far as the 13th century: "A maxim dating from the time of Edward I (1239-1307) states that one who grants a thing must be understood to have granted that without which the thing could not be or exist." *Restatement (Third) of Property: Servitudes* § 2.15 cmt. a (2000); *cf. Carbon County*, 271 Mont. at 473, 898 P.2d at 688 ("[T]he grant of a particular interest in

property tacitly carries with the grant those incidents without which the grant would be of no avail."). These rights are in the nature of a "secondary easement," i.e., "[a]n easement that is appurtenant to the primary or actual easement; the right to do things that are necessary to fully enjoy the easement itself." *Black's Law Dictionary* 587; *see also Loyd v. Southwest Arkansas Utilities Corp.*, 580 S.W.2d 935, 938 (Ark. 1979) ("A secondary easement . . . is simply a legal device that permits the owner of an easement to fully enjoy all of the rights and benefits of that easement."); *Crutchfield v. F.A. Sebring Realty Co.*, 69 So. 2d 328, 330 (Fla. 1954) (" 'Every easement carries with it by implication the right, sometimes called a secondary easement, of doing what is reasonably necessary for the full enjoyment of the easement itself.' "); *cf.* § 70-17-112, MCA. Of course, nothing passes by implication as incidental to the grant of an easement except that which is reasonably necessary to its fair enjoyment. *See Kearney & Son v. Fancher*, 401 S.W.2d 897, 903 (Tex. Civ. App. 2d Dist. 1966); *Laden*, 112 Mont. at 306, 116 P.2d at 884.

¶38    Here, the dam operator has the right to perpetually flood, subirrigate, and drain water on and off the Landowners' properties in the course of regulating the waters of Flathead Lake. It goes without saying that erosion inevitably occurs during this process. Indeed, the Landowners cite two definitions of "erosion" which reflect this fact: (1) "the process by which flood waters lower the ground surface in an area by removing upper layers of soil" (citing Nevada Division of Water Planning, *Water Words Dictionary* 109[8]) and (2) "the gradual eating away of the soil by the operation of currents or tides" (citing

---

[8] http://water.nv.gov/WaterPlanning/dict-1/ww-dictionary.pdf (accessed Aug. 24, 2009). PPLM attached several pages from the *Water Words Dictionary* to its Reply Brief in Support of Motion for Summary Judgment.

*Bouvier's Law Dictionary*).  Likewise, *Webster's* defines "erode" as "to wear away, as land by the action of water."  *Webster's New International Dictionary* 869.  Since a certain amount of "wearing away" is inevitable in the course of perpetually flooding, subirrigating, and draining shoreline properties, a grant of the right to do the latter would be of no avail if it did not also include a grant of the right to do the former.  Hence, the right to cause some erosion is necessary to the enjoyment of the right to perpetually flood, subirrigate, and drain and, thus, is included by implication in the easements.

¶39    The Landowners contend, however, that certain types and degrees of erosion are not allowed.  They begin by distinguishing "flood erosion" from "bank erosion" and "beach erosion," which they define, based on the *Water Words Dictionary*, as follows:

> flood erosion:  the process by which flood waters lower the ground surface in an area by removing upper layers of soil
>
> bank erosion:  destruction of land areas bordering rivers or water bodies by the cutting or wearing action of waves or flowing water
>
> beach erosion:  the retrogression of the shore line of large lakes and coastal waters caused by wave action, shore currents, or natural causes other than subsidence

The Landowners argue that even if "flood erosion" is permissible (since the dam operator has the express right to "flood" their properties), "wave action" erosion is beyond the scope of the easements.  In this regard, they assert that the "massive damage" to their properties has been caused not by flood erosion, but by bank and beach erosion brought on by a combination of artificially high lake levels and storm-driven wave action each fall.  At a minimum, the Landowners contend, there is a genuine issue of material fact as to the kind and causes of the erosion damage at issue here.

¶40 We are not persuaded that the dam operator's erosion right is limited to "flood erosion" as defined by the Landowners. As discussed above, the right to cause erosion is not expressly granted in the easement contracts; rather, it is included by implication with the express right to perpetually flood, subirrigate, and drain. As such, the scope of the erosion right is defined as that which is reasonably necessary to the enjoyment of the express right—which, depending on the circumstances (e.g., how high the lake is regulated and when), may include bank erosion, beach erosion, or some other type of erosion. Accordingly, we cannot agree that bank and beach erosion are *per se* outside the scope of the easements. The question, rather, is whether the specific erosion of which the Landowners complain was and is reasonably necessary during the times it has been occurring. If not reasonably necessary, then that erosion is not within the easements.

¶41 In this regard, PPLM asserts that Flathead Lake's water level is "mandated" by the dam license. This is true with respect to April 15 (2,883 feet), Memorial Day (2,890 feet), and June 15 (2,893 feet). But PPLM cites no term in the license dictating that the lake must be maintained at 2,893 feet into October, and PPLM admitted at oral argument that the Federal Energy Regulatory Commission has imposed no such requirement. On the other hand, the license aside, the parties have come forward with conflicting evidence regarding the kind and causes of erosion and the propriety of keeping the lake at full pool into the fall. For example, the Landowners cite various studies by their consultants, one of whom concluded that lowering the lake to 2,890 feet in October would "essentially stop erosion of the full pool shoreline and greatly reduce damage to shoreline structures," while PPLM cites a 1996 Federal Energy Regulatory Commission report discussing

24

alternative pool management scenarios.  The Landowners also point out that discovery (including their consultants' final reports) had not been completed when the District Court took the motions for summary judgment under advisement.

¶42    We therefore conclude that the question of whether the complained-of erosion was and is reasonably necessary and, thus, within the scope of the easements cannot be resolved at this stage through summary judgment.  Further factual development and, if necessary, a trial are required.  Accordingly, we reverse the District Court's grant of summary judgment in favor of the defendants on the Landowners' "erosion" theory and remand for further proceedings on this issue.

## Issue 3

¶43    *Is the operator of Kerr Dam required not to cause unreasonable damage to, or interfere unreasonably with the enjoyment of, the Landowners' properties?*

¶44    Even if some erosion is reasonably necessary to the enjoyment of the easements, the Landowners contend that the dam operator is required not to cause unreasonable damage to, or interfere unreasonably with the enjoyment of, their properties.  As support for this proposition, they cite *Restatement (Third) of Property: Servitudes* § 4.10 (2000).  Consistent with the law discussed under Issue 2, § 4.10 states that unless limited by the terms of the servitude, the holder of an easement "is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude."  Section 4.10 also states, however, that unless authorized by the terms of the servitude, the easement holder "is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment."  The comments to § 4.10 further explain that

25

the easement holder may not "cause any greater damage than that contemplated by the parties, or reasonably necessary to accomplish the purposes of the servitude" (cmt. g) and may not use the easement "in such a way as to interfere unreasonably with enjoyment of the servient estate" (cmt. h). What constitutes unreasonable damage and unreasonable interference depends on the circumstances, such as the character of the servient estate, the purpose for which the servitude was created, and the use of the servient estate made or reasonably contemplated at the time the easement was created. *See Restatement (Third) of Property: Servitudes* § 4.10 cmts. g, h.

¶45 In their summary judgment briefing, the Landowners cited § 4.10 in arguing that an easement holder must "show that the damage was *no greater than reasonably necessary or contemplated by the parties*," while PPLM cited § 4.10 for the proposition that "[a]n easement holder has the right to cause whatever damage that is 'contemplated by the parties, or reasonably necessary to accomplish the purposes of the servitude.' " In addition, PPLM argued (apparently in the alternative) that because the easements here are specific, "an analysis of what is 'reasonably necessary' is irrelevant. The dominant tenement has the right to use the easement without liability." Addressing this issue, the District Court held that § 4.10 applies only to damages that are *unrelated* to the use of the easement. Thus, reasoning that the Landowners' damages were *related* to the use of the easements (since they occurred in the course of flooding, subirrigating, and draining), the court concluded that MPC and PPLM did not violate any duties imposed by § 4.10.

¶46 The Landowners argue that the District Court's analysis is in error. They contend that the requirement to abstain from unreasonably damaging the servient estate is "an

26

independent requirement that applies to all easement holders." PPLM maintains, however, that § 4.10 "only applies when the easement is general"—i.e., when it lacks specific particulars regarding scope (*see e.g. Guthrie v. Hardy*, 2001 MT 122, ¶ 49, 305 Mont. 367, 28 P.3d 467). PPLM asserts that where an easement's purpose is specifically defined and the easement holder's use is within the scope of the express terms, there is no liability for damage occasioned by such use. PPLM thus argues that because the specific purpose of the easements here is to allow "flooding, subirrigating, draining, or otherwise affecting" the Landowners' properties, and because PPLM has been "acting within [those] limits," the issue of reasonableness is "irrelevant" and the Landowners cannot state a claim. We disagree and conclude that the Landowners' position is correct.

¶47    As a preliminary matter, we observe that contrary to PPLM's contentions during oral argument, the reasonableness standards set forth in § 4.10 are longstanding and well-settled. For example, this Court has recognized that secondary easement rights must be exercised "in such a reasonable manner as not to needlessly increase the burden upon" or do "unnecessary injury to" the servient estate. *Laden*, 112 Mont. at 306, 116 P.2d at 884 (internal quotation marks omitted); *accord Engel v. Gampp*, 2000 MT 17, ¶ 43, 298 Mont. 116, 993 P.2d 701. We further observed in *Laden* that "[o]ne having an easement in another's land is bound to use it in such a manner as not to injure the rights of the owner of the servient tenement. . . . [A]n action for damages will lie on due proof of abuse of the easement right." *Laden*, 112 Mont. at 308-09, 116 P.2d at 884-85 (internal quotation marks omitted); *see also Peterson v. Town of Oxford*, 459 A.2d 100, 103 (Conn. 1983) ("An easement must be used reasonably. Rights must be exercised with

27

reference to the rights of others. . . . '[I]t would be unjust for [an easement owner] to ignore the harmful consequences of his actions.' " (second brackets in *Peterson*)). Along these same lines, in a case involving an easement that we deemed specific in its terms, we said that "[t]he law requires that [the easement holder's] use of the easement not unreasonably burden the servient tenement." *Sampson v. Grooms*, 230 Mont. 190, 195, 196, 748 P.2d 960, 963, 964 (1988). We note that other jurisdictions, many of which have adopted or favorably cited § 4.10, are in accord with these principles.[9] We also note that this Court has already cited § 4.10 as persuasive authority on a related point of law. *See Leichtfuss v. Dabney*, 2005 MT 271, ¶ 30, 329 Mont. 129, 122 P.3d 1220. Thus, the standards set forth in § 4.10 being sound and consistent with our caselaw, we adopt the rule that unless clearly authorized by the terms of the servitude, the holder of an easement is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment.

---

[9] *See e.g. Paxson v. Glovitz*, 50 P.3d 420, ¶¶ 36-37 (Ariz. App. 1st Div. 2002) (applying § 4.10); *Wilson v. Brown*, 897 S.W.2d 546, 550 (Ark. 1995) ("[T]he holder of the dominant estate has a duty to use the property so as not to damage the owner of the servient estate."); *Lazy Dog Ranch v. Telluray Ranch*, 965 P.2d 1229, 1237-38, 1241 (Colo. 1998) (adopting § 4.10); *Peterson*, 459 A.2d at 102 ("The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit."); *Abington Ltd. Partn. v. Heublein*, 717 A.2d 1232, 1240-41 (Conn. 1998) (citing § 4.10 as persuasive authority); *Municipal Electric Auth. v. Gold-Arrow Farms*, 625 S.E.2d 57, 63 (Ga. App. 2005) (applying § 4.10); *Anne Arundel County v. Litz*, 412 A.2d 1256, 1260 (Md. Spec. App. 1980) (" 'An easement is a right of use and cannot be construed to permit such destruction of the underlying fee of the servient estate as is shown by the evidence [here].' "); *Bivens v. Mobley*, 724 So. 2d 458, ¶¶ 25-29 (Miss. App. 1998) (citing § 4.10 as persuasive authority); *Reinbott v. Tidwell*, 191 S.W.3d 102, 111-12 (Mo. App. S. Dist. 2006) (remanding case to the trial court for an analysis under § 4.10); *Thurston Enters. v. Baldi*, 519 A.2d 297, 300 (N.H. 1986) ("The grantee of the easement . . . must use the easement reasonably so as not to damage the possessory interest of the grantor." (citation omitted)).

¶48 We now turn to the crux of the issue, which is not so much the wisdom of the foregoing rule as it is the rule's applicability to the easements at issue. As noted, PPLM argues that § 4.10 applies only to general easements. In essence, PPLM asserts that where an easement is specifically defined, the holder may exercise his or her easement rights "without liability" for causing unreasonable damage to the servient estate. This argument fails for several reasons.

¶49 In construing a written instrument creating an easement, we must give effect to the parties' mutual intention as it existed at the time of contracting, so far as the same is ascertainable and lawful. Section 28-3-301, MCA; *see also Restatement (Third) of Property: Servitudes* Chapter 4 Intro. Note ("[T]he function of the law is to ascertain and give effect to the likely intentions and legitimate expectations of the parties who create servitudes."). The parties' intention, in turn, is to be ascertained from the writing alone "if possible." Section 28-3-303, MCA; *see also* § 70-17-106, MCA; *Restatement (Third) of Property: Servitudes* § 4.1(1). But that is not always possible, even with a specifically defined easement, as servitudes are often created by documents which lack express terms governing the many questions that may arise as to the scope or intended application of the servitude. *See Restatement (Third) of Property: Servitudes* §§ 4.1 cmt. b, 4.2 cmt. a; *Lazy Dog Ranch v. Telluray Ranch*, 965 P.2d 1229, 1237 (Colo. 1998). Perhaps the parties did not foresee the situation that has occurred or did not incur the expense of drafting a document to cover every eventuality. Indeed, PPLM itself asserts that the easement contracts at issue here are "typical" in that they "do not specifically mention every type of damage that may occur to [the Landowners'] properties."

¶50     The *Restatement* thus articulates a number of "default" rules which are to be used by courts to "supplement" the terms of a servitude as necessary to determine the rights and obligations of the parties or their successors. *Restatement (Third) of Property: Servitudes* §§ 4.1 cmt. c, 4.2, 4.10 cmt. a. These rules are set forth in §§ 4.3 through 4.13 of the *Restatement* and, in the case of expressly created easements, may be used "to supplement the specific terms" of the servitude. *Restatement (Third) of Property: Servitudes* § 4.1 cmt. d. Many of the rules simply impose a reasonableness standard.

¶51     For these reasons, we reject PPLM's contention that § 4.10 does not apply here because the easements are specific in nature. For one thing, there is no merit to PPLM's premise that because the parties to an easement endeavored to define the easement in specific terms, they must have succeeded in setting out every term necessary to resolve all disputed questions which could ever arise as to its scope, thereby eliminating any need to resort to the *Restatement*'s supplemental default rules. This premise is utterly divorced from reality, as the instant lawsuit illustrates. Moreover, PPLM fails to recognize the limited nature of an easement. It is a nonpossessory interest in land—a right which one person has to make limited uses of another's property for a particular purpose; it is neither a grant of title to the property nor a possessory interest. *See Blazer v. Wall*, 2008 MT 145, ¶ 24, 343 Mont. 173, 183 P.3d 84; *Taylor v. Montana Power Co.*, 2002 MT 247, ¶ 24, 312 Mont. 134, 58 P.3d 162; *Restatement (Third) of Property: Servitudes* § 1.2 cmt. d. While the easement holder has the right to use the servient estate in a manner that is reasonably necessary to the enjoyment of the servitude, *see* ¶ 37, *supra*; *Restatement*

30

*(Third) of Property: Servitudes* § 4.10, the easement holder does not have an inherent right to inflict unreasonable damage in the course of that use.

¶52    In this connection, we agree with the two presumptions contained in § 4.10—namely, that the easement holder on one hand has the right to use the servient estate in a reasonably necessary manner "[e]xcept as limited by the terms of the servitude" but on the other hand has no right to cause unreasonable damage to the servient estate "[u]nless authorized by the terms of the servitude."  This accords with the commonsense view that the owner of a servient estate expects that the easement holder may do what is reasonably necessary to enjoy the servitude and, in the process, cause reasonable damage to her property, but does not expect the holder to inflict unreasonable damage or interference. Even where the easement's scope has been specifically defined, we will not assume that the owner of the servient estate intended through her silence to grant the unfettered right PPLM claims it has here to unreasonably damage her property.  Such an assumption would lead to the very absurdity we are bound to avoid (§ 28-3-401, MCA).  Rather, we presume that the parties intended a fair balance of their interests and, to that end, intended the easement to be used in such a manner that unreasonable damage to or interference with the servient estate would not occur (except as clearly authorized by the terms of the agreement).  *See Restatement (Third) of Property: Servitudes* § 4.10 cmt. h ("[W]here the parties have not agreed otherwise, the servitude should be interpreted to reach a fair balance of their interests."); *Lazy Dog Ranch*, 965 P.2d at 1238 ("[T]he interests of both parties must be balanced in order to achieve due and reasonable enjoyment of both the easement and the servient estate."); *see also e.g. Sampson*, 230 Mont. at 195, 196, 748

31

P.2d at 963, 964 (although "[a]n easement for a private road" was "specific in its terms," the easement still could not be used so as to "unreasonably burden the servient tenement"); *Stirling v. Dixie Electric Membership Corp.*, 344 So. 2d 427, 428, 429 (La. App. 1977) (although the easement included an express right "to cut and trim trees and shrubbery," this had to be done "in a reasonable manner, with due regard to the rights of all parties"; indiscriminate chemical spraying was not reasonable); *Thurston Enters. v. Baldi*, 519 A.2d 297, 300, 302 (N.H. 1986) (the grantee of an easement "must use the easement reasonably . . . so as not to damage the possessory interest of the grantor"; "destruction of the underlying fee property by the user of an easement is unreasonable").

¶53    For similar reasons, we also reject the contention that § 4.10 applies only to damages that are unrelated to, or do not occur in the course of, the use of the easement. The primary purpose of the rules set out in §§ 4.3 through 4.13 are "to supplement the terms of the servitude" and to aid the court in determining "the rights and obligations of the parties or their successors," including "use rights." *Restatement (Third) of Property: Servitudes* §§ 4.1 cmts. c and d, 4.2, 4.10.  The notion that the "no unreasonable damage" rule prohibits only those damages that the easement holder inflicts on the servient property when he is *not* using the easement belies common sense, and nothing in Chapter 4 of the *Restatement* supports such an approach.

¶54    *Carvin v. Arkansas Power and Light Co.*, 14 F.3d 399 (8th Cir. 1993), on which PPLM relies heavily, does not alter our conclusion.  In *Carvin*, the Eighth Circuit analyzed cases involving Arkansas' "reciprocal duty" rule and concluded that "the owner of the dominant estate has been held liable for *unnecessary* collateral damage to the

servient estate, which did not follow inevitably from the purpose for which he procured the easement." *Carvin*, 14 F.3d at 404. Applying this rule, the court determined that the flooding which occurred on the dates in question "was not an unnecessary collateral result of the privilege granted by the easement, but was instead the very privilege granted by the easement"—namely, to store excess water in an emergency by flooding the land surrounding the lake. *Carvin*, 14 F.3d at 405. The court did not, however, address or express any view on whether the dam operator was entitled to cause *unreasonable* damage to lakeside properties; and *Carvin*, therefore, does not appear to be on point. But to the extent *Carvin* could be read to support PPLM's theory that an easement holder may, in exercising privileges granted by the easement, cause unreasonable damage to the servient estate, we disagree with that decision.

¶55   In conclusion, we hold that the requirement not to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment (unless clearly authorized by the terms of the servitude) is an independent requirement on an easement holder's use of the easement. In other words, this requirement can be breached even if the easement holder is operating within the easement's technical parameters. As applied to the present case, we first note that nothing in the easement language authorizes MPC and its successors to cause unreasonable damage to, or interfere unreasonably with the enjoyment of, the Landowners' properties. Thus, while the dam operator may use those properties in a manner that is reasonably necessary for the convenient enjoyment of its easements, it has a separate obligation not to cause unreasonable damage to the properties or interfere unreasonably with their enjoyment.

¶56    Whether MPC and PPLM have breached this obligation, however, cannot be resolved at this stage through summary judgment.  The parties have come forward with conflicting evidence on this issue; thus, further factual development and, if necessary, a trial are  required.  We accordingly reverse the District Court's grant of summary judgment in favor of the defendants on the Landowners' "unreasonable damage" theory and remand for further proceedings on this issue.

**Issue 4**

¶57    *In evaluating the Landowners' motion for class certification, was the District Court required to take all of their allegations "as true"?*

¶58    In June 2001, the Landowners filed a motion for class certification as to PPLM. Noting that the District Court had already granted such a motion as to MPC, they asserted that PPLM was in "exactly the same position" as MPC had been in before the December 1999 transfer of MPC's interest in Kerr Dam to PPLM.   Thus, they reasoned that the court's decision granting class certification as to MPC was "equally applicable" to PPLM.  They asked that the identical class be certified.

¶59    In response, PPLM argued that the Landowners'  motion for class certification lacked "any factual evidentiary support" and,  consequently, that PPLM could not adequately respond to the motion and the court did not have "a sufficient factual basis" on which to decide the motion.  PPLM asked the court to stay ruling on the motion pending the completion of initial discovery and also requested an evidentiary hearing on the class-certification issue.  In addition, PPLM presented an analysis on the merits of the Landowners' motion, arguing based on "the limited factual allegations set forth to date"

34

that the Landowners could not meet three of the elements necessary to certify a class under M. R. Civ. P. 23(a) and (b)(3).

¶60    The District Court denied PPLM's request for an evidentiary hearing. The court noted that PPLM had submitted "an extensive and thorough brief in opposition to the certification motion and, subsequently, an affidavit in support of such brief," to which the Landowners had filed a reply. The court stated that it could not "imagine what counsel could better present at an evidentiary hearing upon this relatively narrow issue than they have in their briefs and affidavits." Moreover, the court noted that the gravamen of the Landowners' claims was based on the ongoing operation and management of Kerr Dam, regardless of the time-to-time owner. Thus, since it had already heard, considered, and rejected arguments by MPC's counsel on the elements of class certification, and since the operative facts underlying the Landowners' motions as to MPC and PPLM were the same, the court was not persuaded that an evidentiary hearing was needed.

¶61    Thereafter, in a separate order, the District Court granted the Landowners' motion for class certification as to PPLM. In so doing, the court correctly noted that as a general rule, a court is not allowed to engage in analysis of the merits of the plaintiffs' claims in order to determine whether a class action may be maintained (citing *Retired Chicago Police Assn. v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)). However, the court also stated that it was "required to take the Plaintiffs' allegations in support of the class action as true" (citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78, 94 S. Ct. 2140 (1974)). The court then analyzed the pertinent elements of Rule 23 and determined that the Landowners had met all of the requirements for class certification.

¶62     On appeal, PPLM contends that the District Court erred in its analysis of the Landowners' motion by taking all of their allegations "as true." PPLM argues that the court should have made its determination under Rule 23 "based upon the evidence" and, in this regard, suggests that the court should have conducted an evidentiary hearing to ensure that the Landowners do in fact meet the elements of Rule 23. PPLM asks us to "remand the case for determination of the class action utilizing the appropriate standard."

¶63     The Landowners respond that PPLM had "ample opportunity" to submit any evidence it chose and that the District Court was well within its discretion in denying PPLM's request for an evidentiary hearing. Moreover, the Landowners contend that the court actually considered the facts and evidence PPLM claims were material to the class-certification issue. Thus, they conclude that PPLM's concerns over the District Court's handling of this issue are misplaced. They emphasize that "[t]he validity of [their] claims is not to be tested at the class certification stage."

¶64     Contrary to the Landowners' assertion, however, it is not clear from the District Court's order whether the court in fact considered all of the evidence that PPLM contends is relevant to the class-certification issue. In fact, it is doubtful the court did so, given that it applied an incorrect legal standard. The Supreme Court did not state in *Eisen* that a court "is required to take the Plaintiffs' allegations in support of the class action as true" (as the District Court opined). What the Supreme Court said, rather, was that nothing in the language or history of Fed. R. Civ. P. 23[10] "gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be

_____

[10] M. R. Civ. P. 23 is identical in all relevant respects to Fed. R. Civ. P. 23.

maintained as a class action." *Eisen*, 417 U.S. at 177, 94 S. Ct. at 2152; *see also* Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* vol. 7AA, § 1785, 376-77 (3d ed., West 2005) ("[I]t now is clear that an evaluation of the merits of the underlying dispute is not a proper consideration."). Yet, lacking authority to conduct an inquiry into the merits of the suit does not mean the court must take all of the plaintiffs' allegations as true for purposes of evaluating a Rule 23 motion.[11] *See Federal Practice and Procedure* § 1785, 379 ("The Eisen prohibition addresses the concern that the parties should not have to show a probability of success on the merits in order to prove class certification; it does not limit the court's necessary inquiry into the underlying elements of the case in order to evaluate whether Rule 23 has been met.").

¶65 Indeed, "[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Szabo*, 249 F.3d at 675. "A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) (footnote omitted). The Supreme Court has explained that

> the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

---

[11] A motion under Rule 23 differs from a motion under Rule 12(b)(6) where the court does take all of the plaintiff's allegations of fact as true. *See e.g. Lozeau v. Geico Indem. Co.*, 2009 MT 136, ¶ 8, 350 Mont. 320, 207 P.3d 316; *see also Szabo v. Bridgeport Machines*, 249 F.3d 672, 675-77 (7th Cir. 2001).

> Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. . . . [A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.

*General Telephone Co. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982) (citations and internal quotation marks omitted).

¶66    In determining whether to certify a class, the question is simply whether the proposed class and class representative meet Rule 23's requirements for certification. To make that determination, "a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo*, 249 F.3d at 676. To that end, the court may allow discovery and hear evidence. *See* James Wm. Moore, *Moore's Federal Practice* vol. 5, § 23.84[2], 23-386 (3d ed., Matthew Bender 2009); *Sirota v. Solitron Devices*, 673 F.2d 566, 571 (2d Cir. 1982) ("[T]here can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied."); *Retired Chicago Police*, 7 F.3d at 598 ("[S]ome discovery may be necessary to determine whether a class should be certified."). Although there is no absolute requirement that a hearing be held, in many cases a hearing is appropriate and useful—or even necessary, for example, when the paper record before the court on the certification question is inadequate. *See Federal Practice and Procedure* § 1785, 364-68; *Intl. Woodworkers of America v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1268 (4th Cir. 1981) ("It is seldom, if ever, possible to resolve class representation questions from the pleadings, and where facts developed

during discovery proceedings are inadequate, an evidentiary hearing should be held on the request of the parties or, if necessary for a meaningful inquiry into the requisites of Rule 23, by the court sua sponte.").

¶67    We are persuaded that the approach of the federal courts as reflected in the cases cited above is sound.  In this regard, we note that the Second Circuit recently articulated the following guidelines for addressing Rule 23 motions:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Miles v. Merrill Lynch & Co.*, 471 F.3d 24, 41 (2d Cir. 2006).  We adopt these guidelines for purposes of M. R. Civ. P. 23 and hold that the District Court erred in concluding it was "required to take the Plaintiffs' allegations in support of the class action as true." We therefore vacate the court's July 9, 2003 Order on Motion for Class Action Certification as to Defendant PPL Montana, LLC, and Rationale and remand for reconsideration pursuant to the *Miles* guidelines.

¶68    As for PPLM's request for an evidentiary hearing, we hesitate to impugn the District Court's decision on this matter, as the court articulated a number of persuasive

39

reasons for denying PPLM's request. The fact is, however, that the court was operating under an incorrect legal standard at the time. As just explained, the court may look past the Landowners' pleadings to make whatever factual and legal inquiries are necessary in determining whether the proposed class and class representatives meet the requirements for certification under Rule 23. We therefore vacate the District Court's February 21, 2003 Order on Motions Regarding Class Action Certification as to Defendant PPL Montana, LLC, and Rationale and remand for reconsideration.

## CONCLUSION

¶69 We conclude that PPLM's flood easements do not necessarily pose a legal barrier to the Landowners' claims. To summarize, we affirm the District Court's grant of summary judgment in favor of the defendants on the Landowners' "contour line" theory, but we reverse the court's grant of summary judgment in favor of the defendants on the Landowners' "erosion" and "unreasonable damage" theories. Further factual development and, if necessary, a trial are required in order to determine whether MPC and PPLM exceeded the scope of the easements by causing erosion that was not reasonably necessary to the enjoyment of their right to perpetually flood, subirrigate, and drain water on and off the Landowners' properties (*see* ¶¶ 40-42, *supra*), by causing unreasonable damage to the Landowners' properties or interfering unreasonably with the enjoyment of those properties (*see* ¶¶ 55-56, *supra*), or both.

¶70 As for the cross-appeal issue, we vacate the District Court's orders denying PPLM's request for an evidentiary hearing on the class-certification question and granting the Landowners' motion for certification of this lawsuit as a class action as to

40

PPLM. We remand with instructions to reconsider PPLM's request and to reanalyze the class-certification question pursuant to the law discussed under Issue 4.

¶71 Affirmed in part, reversed in part, and remanded for further proceedings.


/S/ JAMES C. NELSON


We Concur:

/S/ DOROTHY McCARTER
District Court Judge Dorothy McCarter
sitting for former Chief Justice Karla M. Gray

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE




Justice W. William Leaphart, concurring.

¶72 I concur. The Opinion correctly notes that an easement is a "nonpossessory interest" in land—a right which one person has to "use" the land of another. Opinion, ¶ 16. I cannot reconcile this definition with the proposition that a person, in exercising such a "nonpossessory" interest via a flood easement, can, through the theory of incidental or secondary easement, completely take or destroy the servient estate through erosion. Opinion, ¶ 37. To my way of thinking, destruction through erosion amounts to the ultimate "possession" of the property. Contrary to the definition of an easement—this is a "taking" of the property as opposed to a mere nonpossessory use.

¶73    However, since the Opinion does leave open the question of whether the complained of erosion was and is reasonably necessary during the times referenced, I forego my definitional reservations and concur.

/S/ W. WILLIAM LEAPHART